UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                 :

NATIONAL CITY GOLF FINANCE,        :
                                 :

               Plaintiff,       :

                                 :         06 Civ. 7784 (GEL)

   -against-                :

                                 :      **OPINION AND ORDER**

HIGHER GROUND COUNTRY CLUB     :
MANAGEMENT COMPANY, LLC,        :
                                 :

             Defendant.      :

                                 :
-------------------------------------------------------------x

Frank Peretore, Peretore & Peretore, P.C., Staten
Island, NY, for plaintiff.

Brian C. Willie, Kostelanetz & Fink, LLP, New
York, NY, for defendant.


GERARD E. LYNCH, District Judge:

       Plaintiff National City Golf Finance ("National City") seeks summary judgment against

Defendant Higher Ground Country Club Management Company, LLC, ("Higher Ground") for

breach of a finance lease of global positioning system ("GPS") units for Higher Ground's golf

carts.  Higher Ground also moves for summary judgment, seeking a declaration that it owes

National City nothing.  In the alternative, Higher Ground requests that it be granted leave,

pursuant to Fed. R. Civ. P. 14(a), to assert third party claims of indemnification and contribution

against ProLink Solutions, LLC ("ProLink"), the seller and supplier of the golfcart GPS systems.

For the following reasons, the cross-motions for summary judgment will be denied, and

defendant's motion to add third party claims against ProLink will be granted.

# BACKGROUND[1]

Higher Ground manages and operates Silo Ridge Country Club ("Silo Ridge"), including the club's golf course. Greg Ward, a traveling salesman for ProLink, a manufacturer of golf paraphernalia, including GPS units for golf carts,[2] made a sales call to Higher Ground to pitch ProLink's GPS systems, but Higher Ground was not interested in leasing or purchasing the units outright, due to the high cost. Months later, Ward made a follow-up sales call to pitch the optional "pay for play" program, whereby, at no cost to Higher Ground, ProLink would install its "ProStar" GPS system, the latest and most technologically advanced GPS system manufactured by ProLink, in Higher Ground's golf carts at Silo Ridge. In exchange, Higher Ground would give all of its golfers the option to use the GPS system. Those golfers who opted to use the system, after a three-hole trial period, would pay for the usage of the GPS system at a rate of $1.50 per 9 holes. Higher Ground would collect those payments and remit them to ProLink. When a golfer chose to use the GPS system, the unit would send a signal to ProLink, which would then keep track of the unit's usage. Ward promised, and Higher Ground understood, that

---

[1] Since this Opinion addresses motions for summary judgment, the Court makes no factual findings, but views the facts in the light most favorable to the non-moving party. Therefore, in evaluating National City's motion for summary judgment, the record must be viewed in the light most favorable to Higher Ground, and in evaluating Higher Ground's motion for summary judgment, the record must be viewed in the light most favorable to National City. Since National City's motion for summary judgment preceded Higher Ground's motion and frames the discussion, this section describes the record in the light most favorable to Higher Ground.

[2] Golf cart GPS systems began to be developed and marketed in the 1990s, and have improved dramatically since then. Newer models permit golfers to judge the exact position of their cart relative to course obstacles, and allow golf clubs to track the progress of golfers through the various greens. Some systems allow clubs to broadcast advertisements to the units, and allow the golfers to pre-order lunch while they are still playing, thereby insuring that their food will be ready by the time they reach the club restaurant.

there would be no other payment obligations. Ward conducted a field demonstration for Higher Ground of ProLink's ProStar system, noting that the optional system would allow Higher Ground to have "all the sizzle" of a golf cart GPS system "without buying the steak." (Affidavit of Robert Caeners, dated May 30, 2007, ¶ 12.)

Following Ward's visits, Higher Ground informed ProLink that it would like to have the ProStar units installed on its golf carts under the optional "pay for play" program, and on April 27, 2005, signed a lease agreement for the installation of those units. Although Ward and ProLink presented Higher Ground with the contract papers, and although ProLink would manufacture and install the GPS units, the lease agreement was not between Higher Ground and ProLink, but between Higher Ground and National City. The written lease does not precisely specify the GPS units to be installed, but instead describes them as "GPS Assemblies" manufactured by ProLink/ParView, LLC.

In late June 2005, ProLink installed GPS units on the Silo Ridge golf carts. However, instead of installing ProStar units, it installed "GameStar" units. The GameStar system was based on outdated technology and, at the time of installation, was already five years old. (See Affidavit of Chris L. Schauerman, dated June 25, 2007, ¶ 5; Caeners Aff. ¶ 16.) Unhappy with the GameStar system, Higher Ground immediately and repeatedly complained to Ward, demanding that the ProStar system be installed. Ward admitted that ProLink had delivered the wrong system, but refused to deliver the promised units, stating that the ProStar system was available only for purchase and was not available for lease as part of the optional "pay for play" program. (Caeners Aff. ¶ 18.) Although Higher Ground was unhappy with the units, and repeatedly demanded that ProLink deliver the correct units, neither Higher Ground nor ProLink

3

disabled or removed the GameStar units from the golf carts, and when golfers chose to use the

system, Higher Ground accepted payment from those golfers and remitted their payments to

ProLink.[3]  However, throughout the season, Higher Ground encountered numerous problems

with the units.  First, based on an internal review of its records, Higher Ground determined that

the number of golfers ProLink calculated to have used the system in any given period was

substantially higher than the number that Higher Ground believed had used the system, and

ProLink/National City expected Higher Ground to make up the difference.  (Caeners Aff. ¶ 21.)

Second, the units themselves malfunctioned in various ways.  (Id. at ¶¶ 19-20.)

In early 2006, Higher Ground introduced a new fleet of golf carts at Silo Ridge, and

again demanded that ProLink install ProStar units.  Ward informed Higher Ground that ProLink

would not install the ProStar GPS systems on the new carts, and that Silo Ridge was obligated to

pay $9,000 to install the GameStar models on the new golf fleet, or "must pay the buyout" which

would be "way over $175,000."  (Caeners Aff. Ex. I.)  The "bottom line," Ward told Higher

Ground, "is that SiloRidge and Prolink will be doing business until [March] 2010."  (Id.)  Higher

Ground refused to have the GameStar system installed on the new fleet of golf carts, and

ProLink (not National City) repossessed the GPS units.  (Id. ¶ 22; see Schauerman Aff. ¶ 3.)

When ProLink repossessed the units in April 2006, "the outdated technology . . . [in] the

GameStar system had negligible value because it had been supplanted by new technology."

(Schauerman Aff. ¶ 4.)  The "sole value of the Higher Ground GPS units in April, 2006, the time

---

[3] It is not clear whether the billing and bill collecting was done by ProLink or by National City.  Viewing the record in the light most favorable to Higher Ground (see Caeners Aff. ¶ 21), a reasonable factfinder could conclude that Pro Link participated in the billing and bill collecting process during the time the GPS units were installed and operating at Silo Ridge.

of their repossession, was their value as scrap." (Id. ¶ 8.)

Following ProLink's repossession of the units, National City sued Higher Ground for breach of the lease agreement. National City now moves for summary judgment, claiming that, by refusing to continue to use the GameStar units, Higher Ground broke their contract with National City, and owe approximately $375,000 in damages, consisting of National City's loss of anticipated revenue from Silo Ridge's golfers' use of the GameStar units. National City argues that this is a simple case of breach of contract – that Higher Ground entered into a finance lease with National City; that equipment was leased to Higher Ground "as is" with "no warranties"; that pursuant to that lease, which contained a "hell or highwater clause," payment by Higher Ground was due under any circumstance; and that the contract clearly provided for liquidated damages in the event of a default. Moreover, National City argues that "any claimed misstatements by ProLink employees and any supposed imperfection in the equipment may not be raised by Higher Ground as a claim or defense." (D. Mem. at 10.)

Higher Ground, on the other hand, opposes summary judgment for National City, and moves for summary judgment itself, claiming that it has been swindled by a "bait and switch" engineered by ProLink and National City, working in tandem, and is entitled to a declaratory judgment that it owes National City nothing. First, it claims that it never agreed to the installation of the GameStar system – a system it claims was obsolete before it was even installed in the carts at Silo Ridge, and a system whose present value, plaintiff admits, is negligible – and that immediately upon installation of the units it demanded that the bargained-for ProStar units be installed. Second, Higher Ground claims that it never understood that it was contracting with any other entity but ProLink. Third, it claims that it never agreed either to a

fixed payment scheme whereby Higher Ground guaranteed a minimum usage level of the GPS

units or to a liquidated damages provision. Instead, Higher Ground claims that Ward had

promised – and Higher Ground had only agreed to – a program whereby Higher Ground allowed

ProLink to install the GPS units on the Silo Ridge golf carts, and Higher Ground would collect

usage payments from those clients who opted to use the GPS units and pass those payments

along to ProLink. In the alternative, Higher Ground moves for permission to implead ProLink

pursuant to Fed. R. Civ. P. 14(a).

## DISCUSSION

I.     <u>Legal Standards</u>

    A.     <u>Summary Judgment</u>

Summary judgment is appropriate where the "pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56

"mandates the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment

bears the initial burden of explaining the basis for its motion and identifying those portions of the

record it believes "demonstrate the absence of a genuine issue of material fact." <u>Id</u>. at 323. The

burden then shifts to the nonmovant to produce evidence sufficient to create a genuine issue of

material fact for trial. Fed. R. Civ. P. 56(e)(2) (When a summary judgment motion is "properly

made and supported, an opposing party may not rely merely on allegations or denials in its own

pleading; rather, its response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial."); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under [Rule 56], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").

The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences and resolve all ambiguities in the nonmovant's favor, and construe the facts in the light most favorable to the nonmovant. Id. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). However, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to withstand a motion for summary judgment. Id. at 252.

A nonmovant's unsupported denials of the movant's evidence, without more, cannot create disputes of material fact. See Fed. R. Civ. P. 56(e)(2) (When a summary judgment motion is "properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading" but must "by affidavits or as otherwise provided . . . set out specific facts showing a genuine issue for trial."). The affidavits must be supported by personal knowledge. Danzer v. Norden Sys., Inc., 151 F.3d 50, 57 n.5 (2d Cir. 1998). The evidence must be admissible. Likewise, "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion." Davis v. State of New York, 316 F.3d 93, 100 (2d Cir. 2002); see also id. ("The nonmoving party must go beyond the pleadings and by [his or] her own

affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (alterations in original) (citation and internal quotation marks omitted).

B.    Contract Interpretation

Under Ohio law, which the parties agreed would govern the lease contract, "[t]he purpose of contract construction is to discover and effectuate the intent of the parties." Graham v. Drydock Coal Co., 76 Ohio St. 3d 311, 313 (1996) (citation omitted). The intent of the parties is "presumed to reside in the language they chose to use in their agreement." Id. (citation omitted). "Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." Id. at 313-14 (citation omitted). Furthermore,

> Where the language of a contract . . . is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.

Id. at 316 (citation and internal quotation marks omitted). "Finally, a contract is to be construed against the party who drew it." Id. at 314 (citation omitted). In construing a contract, courts in Ohio are guided by the doctrine of *expressio unius est exclusio alterius*, meaning that "the expression in a contract of one or more things of a class implies the exclusion of all others not expressed." 18 Ohio Jur. 3d Contracts § 127. "In Ohio, the construction of a contract is a matter of law for the court to decide." Schwartz v. CNA Ins. Co., 406 F. Supp. 2d 844, 847 (N.D. Ohio 2005), citing Latina v. Woodpath Dev. Co., 57 Ohio St. 3d 212, 214 (1991). "The question of whether the language of an agreement is ambiguous is a question of law." Aerel, S.R.L. v. PCC

<u>Airfoils, L.L.C.</u>, 371 F. Supp. 2d 933, 939 (N.D. Ohio 2005) (citations and internal quotation marks omitted). "Once a finding of ambiguity is made, interpretation of the contract will generally become a question of fact for the jury." <u>Id.</u>; <u>Westfield Ins. Co. v. Galatis</u>, 100 Ohio St. 3d 216, 220 (2003).

C.     Finance Leases

Under Ohio law, a finance lease is a:

> three-party transaction involving a manufacturer/supplier, a finance lessor (usually a financing company), and a finance lessee (the party that will use the particular personalty that is the subject of the transaction). The finance lessee selects the property that it needs from the supplier. Then either the finance lessee or the supplier approaches a financing company, which purchases the property and, in turn, leases it to the lessee. The sina qua non of a finance lease is that the finance lessor acts as the supplier of money and not as merchant of goods.

<u>Info. Leasing Corp. v. Chambers</u>, 152 Ohio App. 3d 715, 725 (1st Dist. 2003) (citation and internal quotation marks omitted). A characteristic feature of a finance lease is that "the lessee becomes a beneficiary of the supplier's promises and warranties to the lessor, and . . . the lessee's promises under the lease become irrevocable and independent once the lessee has accepted the goods." <u>Id.</u> at 726. That is, the bank that funds the purchase expects to get paid regardless of whether the lessee is happy with what it chose to lease.[4]

---

[4] In many situations, an enterprise needs expensive equipment to run its business, such as an airplane, crane, or bulldozer, but cannot purchase the equipment with cash due to the equipment's expense. <u>See</u>, <u>e.g.</u>, <u>Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A</u>, 247 F. Supp. 2d 352, 355 (S.D.N.Y. 2002). One option available to such an enterprise is to borrow the money from a bank and then purchase the equipment outright from the manufacturer, subject to the bank having a security interest in the equipment, and thereafter pay the bank back pursuant to a set schedule. Another option is for the bank to purchase the equipment from the manufacturer, and then lease the equipment to the enterprise, subject to a payment schedule. In either situation, the bank is functionally doing the same thing: providing the funding to allow

Since a finance lease typically imposes more stringent obligations on a lessee than a standard lease, the Ohio Code generally requires that certain conditions be met for a lease to be treated as a finance lease.  For a lease to be a finance lease under the Code, the lessor cannot select, manufacture, or supply the goods, and the lessor must acquire the goods or the right to their possession and use in connection with the lease.  Ohio Rev. Code § 1310.01(7)(a)-(b). Furthermore, the lessee must be notified of certain aspects of the transaction in one of four specific ways.  For example, where the lease is not a consumer lease, the lessor can satisfy its statutory notification obligation by informing the lessee in writing (a) "of the identity of the . . . [lessor's supplier], unless the lessee has selected that person and directed the lessor to acquire the goods or the right to possession and use of the goods from that person;" (b) "that the lessee is entitled under Sections 1310.01 to 1310.78 of the Revised Code to the promises and warranties, including those of any third party, provided to the lessor by the [supplier] in connection with or as part of the contract by which the lessor acquired the goods" or the right to their possession and use; and (c) "that the lessee may communicate with the person supplying the goods to the lessor and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies."  Ohio Rev. Code § 1310.01(7)(c)(iv).[5]

---

the enterprise to use the equipment.  The bank is not in the business of selling (and warranting) equipment, but of lending money, and insists on being paid regardless of whether the enterprise is happy with the equipment that it chose.

[5]  The notification requirement is also satisfied (1) where the lessee receives a copy of the contract by which the lessor acquired the goods (or the right to their possession and use) before signing the lease contract; (2) where the lessee's approval of the contract by which the lessor acquired the goods (or the right to their possession and use) is a condition to the effectiveness of the lease contract; or (3) where, before signing the lease contract, the lessee receives a complete

D.    Agency

Although the lessee's promise to pay pursuant to a finance lease is "irrevocable and independent of any conditions as a matter of statutory law," a lessee may still raise certain defenses "such as fraud or duress [and the law relative to principal and agent, estoppel and misrepresentation] pursuant to general principles of law and equity."  Chambers, 152 Ohio App. 3d at 726 (alterations in original) (citations and internal quotation marks omitted).  That is, if the supplier is an agent of the finance lessor, then any promises and warranties made by the supplier may be imputed to the finance lessor, and the lessor becomes more than simply the supplier of money.

An "agency relationship is a contractual relationship created by an express or implied agreement between the parties."  Amerifirst Savings Bank of Xenia v. Krug, 136 Ohio App. 3d 468, 483 (2d Dist. 1999).  A principal agent relationship "exists only when one party exercises the right of control over the actions of another, and those actions are directed toward the attainment of an objective which the former seeks."  Hanson v. Kynast, 24 Ohio St. 3d 171, 173 (1986).  Courts have examined "various factors in determining whether the requisite amount of control exists" including "whether the [purported agent] is performing in the course of the principal's business rather than in some ancillary capacity," and "whether the [purported agent] was receiving any compensation from the principal."  Hanson, 24 Ohio St. 3d at 175.  "[T]he existence of an agency relationship is typically a question of fact."  Hale v. Volunteers of Am., 158 Ohio App. 3d 415, 430 (1st Dist. 2004); see also Park v. Acierno, 160 Ohio App. 3d 117,

statement of, among other things, the promises and warranties provided to the lessor by the supplier regarding the goods financed.  Ohio Rev. Code § 1310.01(7)(c)(i)-(iii).

127 (7th Dist. 2005); <u>Amerifirst Savings Bank of Xenia</u>, 136 Ohio App. 3d at 484; <u>McSweeney v. Jackson</u>, 117 Ohio App. 3d 623, 630 (4th Dist. 1996).

E.     <u>Impleader</u>

The Federal Rules of Civil Procedure allow a defending party to implead a third party "who is or may be liable to it for all or part of the claim against it." Rule 14(a)(1), Fed. R. Civ. P. However, if the defendant "files the third-party complaint more than 10 days after serving its original answer" then "the third-party plaintiff must, by motion, obtain the court's leave." <u>Id</u>. "The purpose of this rule is to promote judicial efficiency by eliminating the necessity for the defendant to bring a separate action against a third individual who may be secondarily or derivatively liable to the defendant for all or part of the plaintiff's original claim." <u>Gross v. Hanover Ins. Co.</u>, 138 F.R.D. 53, 54 (S.D.N.Y. 1991) (citation and internal quotation marks omitted). "Rule 14 is intended to provide a mechanism for disposing of multiple claims arising from a single set of facts in one action expeditiously and economically." <u>Bridge Capital Investors v. Coated Sales, Inc.</u>, No. 88 Civ. 2651, 1991 WL 190552, at *1 (S.D.N.Y. Sept. 16, 1991) (citations and internal quotation marks omitted).

Whether to grant such a motion is left to the sound discretion of the trial court. <u>Kenneth Leventhal & Co. v. Joyner Wholesale Co.</u>, 736 F.2d 29, 31 (2d Cir. 1984); <u>Rosario v. Amalgamated Ladies' Garment Cutters' Union</u>, 605 F.2d 1228, 1247 (2d Cir. 1979); <u>Murphy v. Keller Indus., Inc.</u>, 201 F.R.D. 317, 319 (S.D.N.Y. 2001). Relevant factors in determining whether to grant a movant leave to implead a third party include: (i) whether the movant deliberately delayed or was derelict in filing the motion; (ii) whether impleading would unduly delay or complicate the trial; (iii) whether impleading would prejudice the third-party defendant;

and (iv) whether the third-party complaint states a claim upon which relief can be granted.  <u>Too,</u>

<u>Inc. v. Kohl's Dep't Stores, Inc.</u>, 213 F.R.D. 138, 140 (S.D.N.Y. 2003) (citations and internal

quotation marks omitted).  "Motions for leave to implead non-parties should be freely granted to

promote efficiency unless to do so would prejudice the plaintiff, unduly complicate the trial, or

would foster an obviously unmeritorious claim."  <u>Christos v. Trustees of Columbia Univ.</u>, 94

Civ. 5030, 1995 WL 629000, at *2 (S.D.N.Y. 1995) (citations and internal quotation marks

omitted).  However, the impleader action "must be dependent on the main claim."  <u>Murphy</u>,  201

F.R.D. at 319-20, citing <u>Bank of India v. Trendi Sportswear, Inc.</u>, 239 F.3d 428, 438 (2d Cir.

2000).  The impleader action cannot "operate to enlarge the third-party plaintiff's right to

recovery beyond that available under the controlling substantive law."  <u>Murphy</u>, 201 F.R.D. at

320, quoting <u>Andrulonis v. United States</u>, 26 F.3d 1224, 1233 (2d Cir. 1994).

## II.    <u>Legal Standards Applied</u>

### A.    <u>Contract Issues</u>

#### 1.    <u>Delivery</u>

Higher Ground first argues that the lease agreement was void at its inception because the

bargained-for goods were never delivered, and the delivery of the correct goods was a condition

precedent to the validity of the contract upon which National City sues.  Pursuant to the lease

agreement, Higher Ground agreed to lease "the Equipment" from National City.  (Affidavit of

Lisa Moore, dated April 13, 2007, Ex. A ¶ 2.)  "[T]he Equipment" is defined as "the Equipment

identified on Schedule A attached and made part of this Lease."  (<u>Id</u>.)  Schedule A describes the

Equipment as "10 [inch] GPS Assemblies" manufactured and supplied by "ProLink/ParView,

LLC."  (<u>Id</u>. at Ex. A Schedule A.)  Because ProLink manufactures at least two different GPS

assemblies – the ProStar and GameStar units – which the parties agree are vastly different, and because the contract does not specifically identify the assemblies to be leased, "the Equipment" is an ambiguous term, and the Court must look to extrinsic evidence to help resolve the ambiguity. Graham, 76 Ohio St. 3d at 313-14.

In support of its contentions, National City notes in its Rule 56.1 statement that "ProLink and Higher Ground discussed in great detail the specifications of the GPS Systems that ProLink could provide." (P. Rule 56.1, ¶ 6.) A reasonable factfinder could conclude that the units initially promised by ProLink and expected by Higher Ground were ProStar, not GameStar, units. Higher Ground produces evidence essentially uncontradicted by National City that the sales pitch of ProLink's Greg Ward centered exclusively on the ProStar system and that Higher Ground thought that they were receiving the ProStar system. (See, e.g., Caeners Aff. ¶ 11.) Moreover, the units to be delivered are described as units manufactured by "ProLink/ParView, LLC." According to Chris Schauerman, the Senior Vice-President of National City,"ProLink had acquired a competing manufacturer, ParView, and had developed and was marketing the . . . ProStar technology." (Schauerman Aff. ¶ 5.) A reasonable factfinder therefore could conclude that the reference to "ParView" made it more likely that the units to be delivered incorporated the ParView technology upon which the ProStar (not the GameStar) system was developed. Caeners testified, moreover, that the field demonstration was of the ProStar unit. (Caeners Aff. ¶ 11.) In fact, there appears to be no evidence from the course of those preliminary discussions to support the proposition that the GameStar units were to be delivered.

If, as a reasonable factfinder could conclude, the contract contemplated the delivery of ProStar units as opposed to GameStar units, then Higher Ground was at a minimum entitled to

reject the delivery of the GameStar units, as the delivery "fail[ed] . . . to conform to the lease contract." Ohio Rev. Code §1310.55(A). A reasonable factfinder could further conclude that the goods were not simply defective, but completely and qualitatively different from, and inferior to, the bargained-for units. If ProStar had delivered lawnmowers instead of GPS units, then even assuming SiloRidge maintained physical possession of those lawnmowers, no binding contract for the lease of lawnmowers pursuant to the terms of the lease of the GPS units could exist, because a condition precedent to the effectiveness of the lease contract – the delivery of the correct GPS units – never occurred. So too here, a reasonable factfinder could conclude that the product delivered was not simply defective, but qualitatively different, and therefore, regardless of Higher Ground's subsequent actions, the lease signed by Higher Ground on April 27, 2005, never became effective, because the correct goods never were delivered.[6]

2.     Rejection

Even assuming that the GameStar units were not so qualitatively different from and inferior to ProStar units so as to prevent the lease from becoming effective, Higher Ground insists that it affirmatively and immediately rejected the delivery of the GameStar units before any binding contract was formed. A lessor is entitled to reject the delivery of goods that "fail in any respect to conform to the lease contract." Ohio Rev. Code § 1310.55.

Higher Ground submits essentially uncontested evidence that it immediately complained to ProLink about the delivery of the GameStar units. Although National City claims that it never

_____

[6] The situation here is therefore different from situations where the parties bargained for a particular product that was delivered to and accepted by the lessee but that subsequently failed to meet the lessee's expectations. See, e.g., Wells Fargo Bank Northwest, N.A., 247 F. Supp. 2d at 355; Chambers, 152 Ohio App. 3d at 727.

received notice of Higher Ground's dissatisfaction with the GameStar units, and that, in

detrimental reliance on Higher Ground's silence, it purchased the GameStar units from ProLink,[7]

a reasonable factfinder, on the present record, could choose to disbelieve those assertions, and

conclude, based on the relationship and agreements between ProLink and National City, that

National City received immediate if not prompt notice of Higher Ground's complaints regarding

the allegedly nonconforming goods.

First, at the time Higher Ground signed the lease, National City and ProLink had a formal

business relationship, the purpose of which was to sell ProLink units via National City finance

leasing. As ProLink admits in its 10-K filed with the Securities and Exchange Commission, it

has an agreement with National City in which it shared revenues under the "pay for play"

transactions. (See Affidavit of Brian C. Willie, dated May 30, 2007, Ex. D at 4.) National City

---

[7] National City presents no evidence of when it purchased the units from ProLink, under what terms, and for what amount. ProLink appears to have remained involved at every step of this transaction. Further, National City curiously appears to admit that ProLink could have installed the ProStar system on the SiloRidge golf carts at the end of 2005 for $7,000, and that "for all of $7,000 this entire dispute would have been avoided." (P. Reply at 25-26.) The record raises serious questions not only about the relationship between National City and ProLink, but about who held title to the units and who was controlling the leasing operations. National City insists that, as an independent third party, it purchased the GameStar units in order to lease them to Higher Ground over the course of five years. If this were true, however, ProLink would not have the authority to swap out the GameStar units for the ProStar units and absolve Higher Ground of a duty that it purportedly owed to National City. Furthermore, when Higher Ground complained to Greg Ward about the defective units, Ward noted that the "bank is expecting GPS revenue from SiloRidge," promising that he could "get the buyout for [Higher Ground] but I assure you it will be way over $175,000." (Caeners Aff. Ex. I.) Ward went on to say that "you cannot remove our product until . . . 3/2010." (Id.) A reasonable factfinder could conclude that Ward's use of the term "our product" meant either that he was speaking on behalf of ProLink, thus suggesting that they still owned and controlled the units, or that he was speaking on behalf of National City, thus suggesting that he viewed himself as an agent of National City, which may be relevant in light of the other indicia of an agency relationship between National City and ProLink.

16

admits that this agreement existed and lasted until December 2005 (P. Reply at 19), months after Higher Ground executed the lease documents.[8]

Second, ProLink and National City undeniably worked hand in hand throughout this transaction. For example, during the period the units were installed in Higher Ground's golf carts, ProLink gathered the usage data for the GPS units, which would be incorporated into Higher Ground's bills for its golfers' usage of the units. (Moore Aff. ¶ 7.) Furthermore, when the units were repossessed, they were repossessed by ProLink, not by National City. (See Schauerman Aff. ¶ 3.) Morever, ProLink has maintained possession of those units, and it is ProLink, not National City, that is seeking to resell or re-let the repossessed units. (Id. ¶¶ 6-7.) In addition, it was the ProLink salesman, Greg Ward, who delivered the lease package to Higher Ground on National City's behalf. The introductory letter in the package of lease documents was on ProLink letterhead and signed by Jack Joyce, Vice President of Finance for ProLink/Par View LLC. (See Caeners Aff. Ex. E.) The letter described the contents of the lease package and included general instructions about how to fill out the forms. Although Joyce mentioned "NCGF" in passing (without explaining who or what that entity was), Joyce also invited Higher Ground to "call me upon receipt of this correspondence so that we may review each of the documents enclosed." (Id.)

On the basis of all these factors, a reasonable factfinder could conclude that, because they were business partners, and because their very partnership included the leasing of GPS systems

---

[8] Because National City appears to have "manifested an adoption or belief in [the] truth" of these representations, they are not hearsay. Fed. R. Evid. 801(d)(2)(B). Moreover, the Court can take judicial notice of SEC filings as they are a "source[] whose accuracy cannot reasonably be questioned." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991), citing Fed. R. Evid. 201(b)(2).

to Higher Ground, a rejection of the goods communicated to ProLink would have been passed along to National City.  The lease, by its own terms, "becomes effective only upon written acceptance by an authorized employee of Lessor [National City]," (Moore Aff. Ex. A, ¶ 1), and therefore could not have become effective until, at the earliest, July 8, 2005, when the lease was signed by Molly Williams on behalf of National City.  Prior to that time, Higher Ground had demanded that the GameStar system be replaced with the ProStar system.  (See Caeners Aff. ¶¶ 16-17, 23.)  A reasonable factfinder could therefore conclude that Higher Ground had in fact rejected the non-conforming goods before the lease could become effective.

    3.  <u>Acceptance</u>

   National City nonetheless insists that Higher Ground "accepted" the GameStar units.  The lease provides that:

> The Equipment will be irrevocably accepted by Lessee upon the earlier of (a) the date of delivery to Lessor of a signed Certificate of Acceptance of Leased Equipment or (b) ten days after completion of the installation and training of the Equipment.  Upon completion of installation and training, the Lessee must supply Lessor with a written list of system deficiencies, if any, within 24 hours.

(Moore Aff. Ex. A ¶ 4.)  National City first points to a "Certificate of Acceptance" signed by Silo Ridge's head golf pro, Peter Bakker, on June 23, 2005, as proof that Higher Ground accepted the GameStar units.  (See Moore Aff., Ex. B.)

   As a matter of law, however, Bakker's signature could not and did not bind Higher Ground.  As part of the package of lease documents, National City provided Higher Ground with a "Master Certificate of Incumbency."  Caeners, Higher Ground's general manager, executed the certificate on April 27, 2005, and designated himself as the only person employed by Higher

Ground with the "proper corporate power and authority to execute and deliver any Lease

Agreement between Lessee and National City Golf Finance . . . any Lease Schedules pursuant

thereto and the documents required thereunder."  (Caeners Aff. Ex. G.)  The certificate is clear,

and in the absence of any other clear document expressing otherwise, by the principle of

*expressio unius est exclusio alterius*, see 18 Ohio Jur. 3d Contracts § 127, Bakker was not

authorized to bind Higher Ground.

> Arguing that Bakker had authority to bind Higher Ground, National City notes that:
>
>> Bakker was omnipresent in this transaction . . . Bakker repeatedly
>> met with Ward, the ProLink representative, to discuss the
>> equipment, . . . Bakker called [National City] about payment
>> issues, and . . . Bakker, not Caeners, was the recipient of an email
>> from Ward regarding the defendant's intended return of the
>> equipment and financial consequences.

(D. Reply at 8.)  However, because the "Master Certificate of Incumbency" is unambiguous on

this point, these arguments fail, as they are based on facts extrinsic to the lease documents.

National City can hardly complain of unfair surprise, since it provided the certificate to Higher

Ground and required that it be signed as part of the lease package, and contracts are to be

construed against the party that drafted them.  Graham, 76 Ohio St. 3d at 314.  Moreover, to the

extent that extrinsic facts, such as the course of negotiations preceding and proceeding the

alleged formation of the contract between Higher Ground and National City, are used to

illuminate arguably ambiguous provisions of the lease documents, a reasonable factfinder could

conclude that those negotiations tell a much different story – one involving shady dealings by

ProLink and willful blindness (or tacit acceptance) by National City.

> National City next argues that Higher Ground's silence constituted acceptance pursuant

to the provision of the contract stating that "the Equipment" would be deemed accepted within

"ten days after completion of the installation and training of the Equipment."  (Moore Aff. Ex. A ¶ 4.)  However, a reasonable factfinder could conclude that "the Equipment" never was delivered, installed, or accepted.  Moreover, even if the acceptance clause could have been triggered, it could not have been triggered until at least July 8, 2005, the date the contract became effective (and therefore binding on both parties).  In the absence of any contractual provision governing the time period preceding July 8, 2005, a reasonable factfinder could conclude that National City was "seasonably notifie[d]" of Higher Ground's rejection of the GameStar units, as required by Ohio Revised Code § 1310.55, before the contract could have become effective.

National City points to numerous unforgiving provisions of the contract, including a "hell or highwater" clause and a disclaimer of warranties clause.  The terms of a finance lease can indeed be unforgiving.  A lessee under a finance lease has few defenses to nonpayment because "the lessee's promises under the lease contract become irrevocable and independent."  Ohio Rev. Code § 1310.46(A).  However, these promises only become irrevocable and independent "once the lessee has accepted the goods."  Id.  Since a jury would not be compelled to find such acceptance, it could find that these provisions never became operative.

    4.    Ratification

National City insists that Higher Ground "ratified" Bakker's acceptance of the GameStar systems because Higher Ground maintained physical possession of the units, allowed its golfers to use the GameStar system, and made periodic payments for those golfers who chose to use the units.  (D. Mem. 11.)  However, as even National City notes, "[t]he GameStar system is integrated into the roof of the golf car[t]" (Schauerman Aff. ¶ 5), and a reasonable factfinder

could easily conclude that the units could not be removed without leaving the entire golf cart fleet at Silo Ridge roofless. Moreover, a reasonable factfinder could conclude that, due to the proprietary technology incorporated into the GameStar units (id. ¶ 3), removal of the units would necessitate skilled labor that only ProStar could provide (and refused to give). Even assuming that removal of the units was technologically feasible and could be accomplished while maintaining the golf carts' roofs, a reasonable factfinder could conclude that uninstalling the units from the entire fleet was impractical during the middle of the golf season. Under these circumstances, a reasonable factfinder could conclude that mere continued possession of the GameStar units, assuming they were properly rejected, would not constitute acceptance. See Ohio Rev. Code § 1310.58(B).

National City nonetheless notes that Higher Ground allowed its patrons to use the GameStar units, and paid its rent obligations pursuant to the lease. However, even assuming the units were the wrong goods, they were still installed and operating, and available to golfers who chose to use the units during the course of the season. Higher Ground contends that, out of an abundance of caution (and on the assumption that it was not obligated to pay anything under the "pay for play" system, and that only those of its golfers who chose to use the system after they had the opportunity to try out the system based on a three-hole trial run were to pay for the use of the units), it did not turn off the units and remitted the payments from those golfers who chose to use the units to National City. A reasonable factfinder could conclude, in these circumstances, that Higher Ground's only other option was to turn off the GPS units, and that Higher Ground opted for the more reasonable and cautious approach.

Assuming that Higher Ground had properly rejected the units, and was entitled to the delivery of the ProStar system, then it may have a remedy against ProLink for the failure to deliver the correct goods. Higher Ground would then have had a duty to mitigate its damages, which very well may have included allowing its golfers to use the GameStar system (and therefore remit payments made by its golfers for the use of the system) until ProLink properly installed the correct units. The "duty to minimize damages . . . requires the plaintiff to use reasonable care to avoid loss." Chambers, 152 Ohio App. 3d at 727 (citations and internal quotation marks omitted). A reasonable factfinder could therefore conclude not only that Higher Ground's rejection was clear, but also that Higher Ground's actions reasonably minimized the damage claims that different parties may potentially have against each other, and would not, under the circumstances, constitute acceptance.

5.   Damages

National City asserts that the lease agreement, by its terms, incorporated a "Pay for Play Payment Schedule" that entitles it, upon default, to $373,749.41 in liquidated damages. (See Moore Aff. ¶¶ 7, 9(7), 10.) However, a reasonable factfinder could conclude otherwise. Pursuant to the terms of the lease, where the payment schedule is "Pay For Play," as it is here, in the event of default by the lessee, the lessee shall be liable for a "Stipulated Loss Value," which "shall be an amount equal to the average rounds per month as set forth in the Payment Schedule times the Usage Fee times the number of months remaining in this agreement." (Moore Aff. Ex. 1, ¶ 13.) The Payment Schedule contains no dollar amount indicating the contractual "Usage Fee" per round. (See Caeners Aff. Ex. C.) The lease documents are therefore ambiguous regarding whether plaintiff is contractually entitled to any liquidated damages. National City

points to external evidence which it insists proves that "defendant agreed to the usage fees of $3 and $1.50" (P. Reply at 23), and therefore agreed to plaintiff's calculation of the stipulated loss value. However, the record is far from clear on this point. Higher Ground insists that it only agreed to collect $1.50 per 9 holes of golf from golfers who chose to use the system pursuant to an optional "pay for play" system, and never agreed to a stipulated loss value based on a contractual "usage fee" in the event of any alleged default. A reasonable factfinder could agree.[9]

For these reasons, National City's motion for summary judgment must fail. Higher Ground's motion for summary judgment on these points likewise must fail. Although Higher Ground's factual presentation is persuasive, and its position is likely to have strong jury appeal, enough factual uncertainty surrounds these events that these ambiguities in the lease cannot be resolved absent a trial.

B.    Statutory Requirements of a Finance Lease

As part of its motion for summary judgment Higher Ground argues in the alternative that, assuming that a valid contract was formed by the delivery and acceptance of the GameStar units,

---

[9]  In any event, the amount of damages that National City seeks may well exceed those amounts allowed by § 1310.50 of the Ohio Code. Damages "may be liquidated in the lease agreement but only at an amount or by a formula that is reasonable in light of the then anticipated harm caused by the default or other act or omission." Ohio Rev. Code § 1310.50(A). National City seeks in excess of $370,000 in damages for goods that it admits are now worthless. Of course, the test for the reasonableness of liquidated damages centers not on the reasonableness of the damages provisions at the time of the default, but at the time the contract was made (assuming it was made). Nonetheless, assuming the damages provisions are as National City insists them to be, a reasonable factfinder could conclude that, at the time they were made, they unreasonably anticipated the harm caused by a potential default. A reasonable factfinder could conclude that at the time the lease was signed by Higher Ground, the GameStar units were based on antiquated technology that had already been replaced by a newer, more advanced generation of golf cart GPS systems, and that their prompt depreciation, like other forms of electronic gadgetry, would have been reasonably considered inevitable. National City's damages calculations are therefore highly dubious, and cannot carry it to summary judgment.

the lease cannot be considered a finance lease, therefore rendering the contractual hell-or-high

water clause unenforceable.

The contract reads: "if Article 2A–Leases of the Uniform Commercial Code applies to

this Lease, this Lease will be considered a 'finance lease' as that term is defined in Article 2A."

(Moore Aff, Ex. A ¶ 19.)  Chapter 2A of the UCC applies to "any transaction, regardless of form,

that creates a lease."  UCC § 2A-102; <u>see</u> <u>also</u> Ohio Rev. Code § 1310.02(A) (Chapter 1310 of

the Ohio Revised Code, which incorporates Chapter 2A of the UCC, "apply to any transaction,

regardless of form, that creates a lease.")  The contract further provides that:

> Lessee agrees that either (a) Lessee has reviewed, approved, and
> received, a copy of the Supply Contract or (b) that Lessor has
> informed Lessee of the identity of the Supplier, that Lessee may
> have rights under the Supply Contract, and that Lessee may contact
> the Supplier for a description of those rights.

(Moore Aff, Ex. A ¶ 19.)  Higher Ground argues that these provisions do not satisfy National

City's notification obligations under Ohio Rev. Code §1310.01(7)(c), thereby preventing the

lease from being considered a finance lease.  National City insists that the default statutory

notification provisions are immaterial because Higher Ground explicitly agreed to a finance

lease.  Although the contractual provision is not as explicit as it could be, it is nonetheless clear.

The document provides that if Article 2A applies to the lease, then the lease will be considered a

finance lease.  Since Article 2A applies to all leases, then this lease is to be considered a finance

lease.  As a general matter, the parties are free to contract around default provisions of the UCC.

"Freedom of contract is the basic emphasis of Article 2A of the UCC and [Ohio Revised Code]

Chapter 1310.  Thus, most of the provisions of Article 2A can be drafted out of an agreement, so

with few exceptions Article 2A serves mainly to fill gaps that the parties did not expressly

cover." Chambers, 152 Ohio App. 3d at 727 (citations and internal quotation marks omitted). Higher Ground provides no legal support for the proposition that, between merchants, the parties should not be able to contract around these provisions.[10]

C.      ProLink as National City's Agent

Higher Ground also argues in support of its motion for summary judgment that ProLink acted as National City's agent during the course of this transaction, and therefore any defenses that Higher Ground may have against ProLink can be asserted against National City.  National City points to a contractual provision that appears to foreclose this argument.  (See Moore Aff. Ex. A ¶ 3, "Lessee agrees that neither supplier nor any salesperson, employee or agent of supplier is lessor's agent or has any authority to speak for lessor or to bind lessor in any way.") Even assuming the lease by its terms does not foreclose this issue, it would be for the factfinder to resolve at trial.  Because a reasonable factfinder could conclude on the present record that ProLink was not National City's agent for purposes of the transaction, Higher Ground's arguments do not entitle it to summary judgment on this point.

─────────────

[10] Assuming that the parties could not contract around these provisions, National City insists that the contract meets the statutory requirements of Ohio Revised Code § 1310.01(7)(c), citing Information Leasing Corp. v. King, 155 Ohio App. 3d 201, 208-09 (1st Dist. 2003), for support.  The contracts both here and in King provide that the lessee "may have rights under the supply contract." Id.; (Moore Aff. Ex. A ¶ 19).  However, the contract in King also provided that "[a]ny warranties the vendor gave to us [the lessor] . . . we hereby assign (pass) to you [the lessee].  You may contact the vendor for a statement of such warranties, if any." Id. at 209. National City points to no similar provision in its lease documents.  (Cf. Moore Aff. Ex. A ¶ 4.) In this particular situation, where a lessee has not received another form of notice, see Ohio Rev. Code § 1310.01(7)(c)(i)-(iii), the lessor must inform the lessee that it is "entitled . . . to the promises and warranties . . . provided to the lessor" by the supplier, Ohio Rev. Code § 1310.01(7)(c)(iv), and it is doubtful that the National City contract met these conditions.

D.    Impleading ProLink

In the alternative, Higher Ground seeks leave to assert third party claims of indemnification and contribution against ProLink pursuant to Fed. R. Civ. P. 14(a).  (See Willie Aff. Ex. C.)  The third-party complaint is dated May 30, 2007.  (Id.)  This case was transferred to this district from the Southern District of Ohio on September 28, 2006, and on November 29, 2006, Higher Ground answered National City's complaint, asserting counterclaims against National City.  Fact discovery, originally set to close on May 1, 2007, was stayed on March 21, 2007, pending the resolution of the cross motions for summary judgment.

Since the third-party claim arises from the set of facts that constitute the foundation of the current dispute, it would appear to serve the interests of judicial economy to allow Higher Ground to implead ProLink.  Higher Ground's claims do not appear to be without foundation, as ProLink "is or may be liable to [Higher Ground] for all or part of [National City's] claim against it."  Fed. R. Civ. P. 14(a)(1).  Moreover, there appears to be no prejudice to National City or ProLink if ProLink were impleaded.  Although Higher Ground could have moved to implead ProLink earlier in the dispute, discovery has not yet closed.  In light of the current posture of the case, introducing ProLink into the discovery process is unlikely to delay that process, because the dealings between ProLink and Higher Ground, as well as between ProLink and National City, would in any event be relevant to the resolution of the current dispute.  Therefore, Higher Ground will be granted leave to serve the third-party complaint on ProLink.

## CONCLUSION

For the foregoing reasons, the cross motions for summary judgment are denied, and defendant's motion for leave to serve a summons and third-party complaint on ProLink is granted.

SO ORDERED.

Dated: New York, New York
April 3, 2008

GERARD E. LYNCH
United States District Judge