UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

NATIONAL CITY GOLF FINANCE,

          Plaintiff,

    -v.-

HIGHER GROUND COUNTRY CLUB
MANAGEMENT COMPANY, LLC,

          Defendant – Third-Party
          Plaintiff,

    -v.-

PROLINK SOLUTIONS, LLC,

          Third-Party Defendant.

-----------------------------------------------------------x



06 Civ. 7784 (GEL)

**OPINION AND ORDER**

Frank Peretore, Peretore & Peretore, P.C.,
Staten Island, NY, for plaintiff.

Brian C. Wille, Kostelanetz & Fink, LLP,
New York, NY, for defendant – third-party plaintiff.

Marc D. Leve, Silverberg, Stonehill, Goldsmith &
Haber, P.C., New York, NY, Robert J. DuComb, Jr.,
Phoenix, AZ, for third-party defendant.

GERARD E. LYNCH, District Judge:

    Defendant and third-party plaintiff Higher Ground Country Club Management Company,

LLC ("Higher Ground") asserts claims under New York state law against third-party defendant

ProLink Solutions, LLC ("ProLink") for breach of warranty and for indemnification and

contribution for any losses Higher Ground may incur in connection with the claims brought

against it by National City Golf Finance ("National City"). Pursuant to an arbitration clause in

the Service Agreement provided by ProLink to Higher Ground, ProLink moves to dismiss the Third-Party Complaint or, in the alternative, to compel arbitration, to enforce the clause selecting Maricopa County, Arizona, as the forum for arbitration, and to stay the proceedings until the arbitration is completed.  For the reasons stated below, ProLink's motion will be granted, and proceedings on the Third-Party Complaint will be stayed pending arbitration.

## BACKGROUND

### I.     The Underlying Dispute

The facts of the underlying dispute are discussed more fully in this Court's opinion in National City Golf Finance v. Higher Ground Country Club Management Company, LLC, No. 06 Civ. 7784, 2008 WL 904728 (S.D.N.Y. Apr. 3, 2008).  Higher Ground manages and operates the Silo Ridge Country Club ("Silo Ridge"), including the club's golf course.  ProLink is a manufacturer of distance measurement and course management systems for golf courses.  Greg Ward, a ProLink salesman, made a series of sales calls to Higher Ground to pitch ProLink's GPS systems in 2004 and 2005.  According to Higher Ground, Ward demonstrated the most technologically advanced and fully featured of its GPS systems, the ProStar model, to Higher Ground's general manager Robert Caeners, who agreed to lease it on a "Pay-for-Play" basis. (Affidavit of Brian C. Wille, dated July 1, 2008 ("Wille Aff."), Ex. A ¶¶ 10-13.)

On April 27, 2005, Ward delivered a Lease Agreement and a Service Agreement to Higher Ground.  (Id. ¶¶ 13-15; Affidavit of Gregory Ward, dated July 10, 2008 ("Ward Aff.") ¶ 9.)  The Lease Agreement committed Higher Ground to remit to National City Golf Finance all of the payments Higher Ground received from golfers using the GPS system.  The Service Agreement laid out the terms for the installation, configuration and ongoing maintenance of the GPS units by ProLink for Higher Ground.

2

In June of 2005, ProLink installed GameStar GPS units on the golf carts at Silo Ridge. (Wille Aff., Ex. A ¶ 16.) The GameStar GPS system was an older model with fewer features than the ProStar model that Ward had demonstrated to Higher Ground and that Higher Ground claims it expected to receive. (Third-Party Compl. ¶ 8; Third-Party Pl.'s Opp'n 3.)

Higher Ground was dissatisfied with the units installed. Although Higher Ground let golfers use the GPS system and remitted payments to National City (Wille Aff., Ex. A ¶¶ 18-21; Affidavit of Lawrence D. Bain, dated July 10, 2008 ("Bain Aff."), Ex. G.), it also repeatedly complained to ProLink about problems with the GPS equipment and requested regular servicing of it. (Wille Aff., Ex. A ¶¶ 18-21; Bain Aff., Ex. F.)

When Higher Ground leased new golf carts in early 2006, it refused to pay to have the GameStar units installed on the new carts. (Wille Aff., Ex. A ¶ 22.) ProLink repossessed the units in April of 2006.

## II. The Lease Agreement and the Service Agreement

The package of documents Ward presented to Caeners on April 27, 2005 included the Lease Agreement, a Payment Schedule, and a Certificate of Acceptance, all of which Caeners signed. (See Wille Aff., Ex. B.) Ward also gave Higher Ground a Service Agreement, governing the terms of ProLink's installation, service and removal of the GPS units for Higher Ground, which Ward alleges Caeners also signed. (Ward Aff. ¶¶ 9-10.)

The Service Agreement includes an arbitration clause, which provides that:

> All disputes under this Agreement shall be submitted to binding arbitration in accordance with the procedures of the Commercial Rules of the American Arbitration Association and judgment of the arbitrator shall be binding as a final judgment and shall be entered by a court of competent jurisdiction. The procedures specified herein shall be the sole and exclusive procedure for resolution of disputes arising out of or relating to this Agreement except that [ProLink] may

3

> seek a preliminary injunction or other preliminary judicial relief
> necessary to protect its rights in, and avoid irreparable damage to, the
> ProLink System.

(Affidavit of Steve Fisher, dated June 17, 2008 ("Fisher Aff."), Ex. A ¶ 11.)  The Service

Agreement also includes a forum selection clause which states that "[t]his Agreement shall be

considered to have been made in the State of Arizona and shall be governed by and interpreted in

accordance with the laws of the State of Arizona.  Venue for any dispute regarding this

Agreement shall be in Maricopa County, Arizona."  (Id. ¶ 12.9.)

The record includes an unsigned copy of the Service Agreement (Id., Ex. A), but ProLink

has not produced a copy signed by Caeners.  Caeners contends that he has "no recollection of

ever signing" the Service Agreement and has "no reason to believe that such an agreement was

ever signed."  (Affidavit of Robert Caeners, dated July 1, 2008 ("Caeners Aff."), ¶ 5.)

## III.    Procedural History

Following ProLink's repossession of the units, National City sued Higher Ground for

breach of the lease agreement.  National City moved for summary judgment on the grounds that

payment by Higher Ground was due under any circumstances and, that by refusing to continue to

use the GameStar units, Higher Ground had breached its contract.  Higher Ground also moved

for summary judgment, contending that it had been swindled by ProLink's alleged bait and

switch and owed National City nothing.  In the alternative, Higher Ground sought permission to

implead ProLink pursuant to Fed. R. Civ. P. 14(a).  On April 3, 2008, this Court denied both

summary judgment motions and allowed Higher Ground to implead ProLink.  See National City

Golf Finance, 2008 WL at *12-13.

In its Third-Party Complaint, Higher Ground alleges that it is entitled to damages

because ProLink breached its warranty that it would (a) provide Higher Ground with the ProStar

4

model and (b) that the model would operate as represented. (Third-Party Compl. ¶¶ 14-15.)
Higher Ground also demands indemnification and contribution, arguing that, due to the alleged
breach of warranty, ProLink is liable to Higher Ground for any damages Higher Ground may be
found to owe to National City Golf. (Id. ¶¶ 7-8.)

Pursuant to the arbitration provision in the Service Agreement, ProLink now moves to
dismiss the Third-Party Complaint or to stay the proceedings and compel arbitration in Maricopa
County, Arizona. Higher Ground responds that its claims are unrelated to the Service
Agreement and therefore fall outside the scope of the arbitration clause, and also that the Service
Agreement was never signed and is thus unenforceable under the New York statute of frauds.

## DISCUSSION

### I.    The Federal Arbitration Act

Pursuant to the Federal Arbitration Act ("FAA"), an arbitration clause within any
"contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and
enforceable, save upon such grounds as exist at law or in equity for the revocation of any
contract." 9 U.S.C. § 2. Higher Ground is a limited liability company organized and existing
under the laws of the State of New York, with a principal place of business in Amenia, New
York. ProLink is a limited liability company organized and existing under the laws of the State
of Delaware, with its headquarters in Chandler, Arizona. The manufacture and installation of the
GPS units involved materials and labor in interstate commerce. As a result, the agreement
between Higher Ground and ProLink is a "contract evidencing a transaction involving
commerce" and is therefore governed by the FAA. 9 U.S.C. § 4; see also Garten v. Kurth, 265
F.3d 136, 142 (2d Cir. 2001); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395,
401 (1967).

5

Federal policy strongly favors arbitration as an alternative dispute resolution process. See, e.g., Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995); David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 248 (2d Cir. 1991). The Second Circuit has noted that the FAA "requires the federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." Vera v. Saks & Co., 335 F.3d 109, 116 (2d Cir. 2003).[1]

Section 3 of the FAA authorizes a stay of federal proceedings "where the court is satisfied that the issue before it is arbitrable under the agreement." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 844 (2d Cir. 1987); see 9 U.S.C. § 3. Although Section 4 of the FAA allows a court to compel arbitration, "a federal court lacks authority pursuant to 9 U.S.C. § 4 to compel arbitration outside its district." Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc., 269 F. Supp. 2d 356, 363 (S.D.N.Y. 2003); see 9 U.S.C. § 4 ("the hearing and proceedings, under [the parties' arbitration] agreement, shall be within the district in which the petition for an order directing such arbitration is filed"). Because the arbitration provision in ProLink's Service Agreement provides for arbitration in Maricopa County, Arizona (Fisher Aff., Ex. A ¶ 12.9), only a dismissal or a stay of proceedings pending arbitration is available as relief in this case. See Sea Spray, 269 F. Supp. 2d at 363 ("[When] presented with a petition to compel arbitration outside of the district, the district court should dismiss the petition or, upon motion, stay its

---

[1] Higher Ground alleged in a May 29, 2008 letter to ProLink's counsel that ProLink had "waived any right to demand arbitration by serving an Answer in this action." (Affidavit of Robert J. DuComb, dated June 17, 2008, Ex. D.) Absent prejudice, however, filing an answer does not waive the right to arbitrate. Rush v. Oppenheimer, 779 F.2d 885, 889 (2d Cir. 1985).

proceedings." (internal quotation marks omitted)).[2]

When faced with an arbitration dispute, a court must first "determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement." Mehler v. Terminix Intern. Co. L.P., 205 F.3d 44, 47 (2d Cir. 2000); see also Campaniello Imps., Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 666 (2d Cir. 1997).

## II.    Existence of an Agreement To Arbitrate

To determine whether an agreement to arbitrate exists, courts apply state contract law. Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 45-46 (2d Cir. 1993). "When deciding whether parties agreed to arbitrate a certain matter . . . courts generally should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); see also Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62-63 (1995); Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 475-76 (1989).

Higher Ground asserts that it cannot be held to have agreed to arbitrate because it did not sign the Service Agreement in which the arbitration clause was located.  Higher Ground adduces testimony from Robert Caeners, who contends that he has "no recollection of ever signing such

---

[2] Although the law is clear that this Court cannot compel arbitration in Arizona, the circuits are split as to whether a court may compel arbitration in its own district in contravention of the venue provision in the arbitration agreement. Compare Ansari v. Qwest Commc'ns Corp., 414 F.3d 1214, 1219-20 (10th Cir. 2005) ("a district court lacks authority to compel arbitration . . . in its own district if another has been specified for arbitration," 49 F.3d 323, 328 (7th Cir. 1995) (internal quotations omitted)), with Textile Unlimited, Inc. v. A..BMH & Co., 240 F.3d 781, 783 (9th Cir. 2001) (the FAA "does not require venue in the contractually-designated arbitration locale"), and Cont'l Grain Co. v. Pant Russell, 118 F.2d 967, 969 (9th Cir. 1941) (holding that a district court can compel arbitration in its own district). This Court need not decide whether it can compel arbitration in this district in contravention of the venue provision in the parties' arbitration agreement because no party has requested such relief.

an agreement" and has "no reason to believe that such an agreement was ever signed." (Caeners Aff. ¶ 5.) Higher Ground also points to the affirmation of Steve Fisher, Chairman of ProLink's Board of Directors, that "ProLink is currently unable to locate a fully executed copy" of the Service Agreement (Fisher Aff. ¶ 11) as evidence that the Service Agreement was never executed. (Third-Party Pl.'s Opp'n 19-20.)

In New York,[3] arbitration agreements are governed by New York C.P.L.R. § 7501, which states that "[a] written agreement to submit any controversy thereafter arising or any existing controversy to arbitration is enforceable without regard to the justiciable character of the controversy and confers jurisdiction on the courts of the state to enforce it and to enter judgment on an award." Courts have consistently interpreted this rule to require that an agreement to arbitrate be in writing but not necessarily be signed by the party to be bound. "[I]t is well-established that a party may be bound by an agreement to arbitrate even absent a signature." Genesco, 815 F.2d at 846 (citing McAllister Brothers at 524); see also Washington Heights v. District 1199, 748 F.2d 105, 107-09 (2d Cir. 1984) (arbitration can be enforced without a formally executed arbitration agreement if arbitration was the intent of the parties); Royal Air Maroc v. Servair, Inc., 603 F. Supp. 836, 840-42 (S.D.N.Y. 1985) (even without a signed arbitration agreement, C.P.L.R. § 7501 can be satisfied by determining the intent of the parties and examining the integration of several documents); Crawford v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 319 N.Y.2d 291(1974) (written agreement to arbitrate need not be signed to be

---

[3] ProLink argues that all proceedings related to the Third-Party Complaint are governed by Arizona law since the Service Agreement contains a choice of law provision stating that the Agreement "shall be governed by and interpreted in accordance with the laws of the State of Arizona." (Fisher Aff., Ex. A ¶ 12.9; Third-Party Def.'s Mem. 5.) But a contractual provision adopting Arizona law cannot apply to the determination of whether the Service Agreement is a binding contract in the first place.

enforceable if there is other proof that parties actually agreed to arbitrate); God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Associates, LLP, 6 N.Y.3d 371 (2006) (where both parties operated under terms of the unsigned contract and one party relied on the contract in making its claim, arbitration clause could be enforced); Liberty Management & Const. Ltd. v. Fifth Ave. & Sixty-Sixth Street Corp., 620 N.Y.S.2d 827 (1st Dept. 1995) (arbitration clause in contract unsigned by contractor was enforceable, because contractor indicated acceptance by complying with the contract's general conditions).  In accordance with ordinary principles of contract law, "[t]he critical issue is not whether the [agreement] was signed by the party sought to be charged . . . but whether there was a meeting of the minds of the parties as to the essential terms of the agreement, even though unsigned by one party."  A/S Custodia v. Lessin Int'l., Inc., 503 F.2d 318, 320 (2d Cir. 1974).

Higher Ground argues, however, that the New York statute of frauds raises a higher bar than C.P.L.R. § 7501 by requiring a signed writing for any agreement lasting longer than a year. General Obligations Law 5-701(a)(1) states that:

> every agreement, promise or undertaking is void, unless it or some
> note or memorandum thereof be in writing, and subscribed by the
> party to be charged therewith, or by his lawful agent, if such
> agreement, promise or undertaking . . . [b]y its terms is not to be
> performed within one year from the making thereof . . . .

The Service Agreement between Higher Ground and ProLink was to run concurrently with the 60-month Lease Agreement between Higher Ground and National City (Fisher Aff., Ex. A ¶ C(3)), and so was not capable of being performed within a year.  Higher Ground thus argues that for ProLink to enforce the arbitration clause in the Service Agreement, the Agreement would need to satisfy the statute of frauds – that is, be in writing and subscribed by Higher Ground, the party to be charged.

9

The fact that neither party can now produce a signed copy of the Service Agreement, however, does not in itself mean that the contract does not satisfy the statute of frauds. If the Service Agreement had been signed but was later lost or destroyed, the Agreement would satisfy the statute of frauds and be binding against Higher Ground. Schwartz v. Greenberg, 102 N.Y.S. 2d 367 (Sup. Ct. Westchester Co. 1951); In re Bernard's Estate, 26 N.Y.S. 2d 767 (Sur. Ct. Bronx Co. 1941); see also 61 N.Y. Jur. 2d Statute of Frauds § 157. Whether Higher Ground signed the Service Agreement is a disputed question of fact. Higher Ground, relying on the absence of a signed document and the testimony of its officer Robert Caeners that he has "no recollection of ever signing such an agreement and . . . no reason to believe that such an agreement was ever signed" (Caeners Aff. ¶ 5), maintains that it never signed the Service Agreement and that the statute of frauds thus renders the entire Agreement void.

ProLink, in contrast, asserts that, despite its inability to locate a signed copy of the Service Agreement, Higher Ground did in fact sign the contract. ProLink adduces testimony from Ward that he "received from Silo Ridge Country Club a signed copy of each document that I had delivered to Silo Ridge Country Club that was needed to memorialize the lease transaction," including the Service Agreement. (Ward Aff. ¶¶ 9-10.)[4] It also points out that

---

[4] ProLink also submits the testimony of Lawrence Bain, President and CEO of ProLink, that payment to Ward would only have been made upon the receipt of a signed Service Agreement. (Bain Aff. ¶ 9.) Higher Ground correctly points out that Fisher's testimony is not admissible as it is not based on personal knowledge. See, e.g., Portside Growth and Opportunity Fund v. Gigabeam Corp., Inc., 557 F. Supp. 2d 427, 431, n.16 (rejecting affidavit that was not based upon personal knowledge); see also Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999) ("[a] court may . . . strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements"). To the extent that Bain purports to testify about what would have occurred under hypothetical circumstances, his testimony is inadmissible. Bain may however, adduce admissible testimony about ProLink's customary operating procedures that, if credited by a factfinder, could support an inference about what was done or not done in this particular case.

Higher Ground's Third-Party Complaint indicates that it did sign the Service Agreement with ProLink. The Third-Party Complaint asserts that, on April 27, 2005, Ward presented Higher Ground with the Lease Agreement and the Service Agreement and that "Higher Ground, through one of its officers, Robert Caeners . . . signed *these agreements* on April 27, 2005." (Third-Party Compl. ¶ 7; emphasis added.) Elsewhere in the Complaint, too, Higher Ground implies that it signed the Service Agreement, arguing that "[i]n inducing Higher Ground to enter the Lease and Service Agreements, ProLink . . . warranted and/or guaranteed" that it would supply the ProStar model and that the system would operate in particular ways. (Id. ¶ 14.) In fact, the entire Third-Party Complaint is predicated on the existence of a contract between ProLink and Higher Ground.

The record as it now stands presents a question of fact as to whether the Service Agreement was signed by Higher Ground. This Court need not decide that factual issue because, contrary to Higher Ground's argument, whether it signed the Service Agreement is not determinative of the existence of an agreement to arbitrate.

Under the FAA, "the question of arbitrability – whether a [contract] creates a duty for the parties to arbitrate the particular grievance – is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT & T Technologies v. Communications Workers, 475 U.S. 643, 649 (1986). When a contract for arbitration is clearly established, all disputes identified in the arbitration contract must be decided through arbitration proceedings. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). By contrast, whether an arbitration agreement exists in the first place is a threshold matter for courts to determine. See First Options, 514 U.S. at 944-45.

11

Courts have, however, drawn a distinction between disputes as to the validity or existence of the arbitration clause itself and disputes as to the validity of the larger contract in which the arbitration clause can be found.  The Supreme Court has held that, when a party challenges the validity of a contract *as a whole*, and does not expressly contest the validity of an arbitration provision within it, the challenge to the overall contract must be resolved by an arbitrator; the arbitration provision is considered evidence that the parties intended to arbitrate any dispute over the contract's validity.  See Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 449 (2006); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04 (1967).

In Prima Paint, the Court determined that, if a party claimed fraud in the inducement of "the arbitration clause itself – an issue which goes to the 'making' of the agreement to arbitrate – the federal court may proceed to adjudicate it.  But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally."  388 U.S. at 404.  The Court held that,

> in passing upon . . . [an] application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate.  In so concluding, we not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.

Id.[5]

---

[5] See also Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F 2d 402, 409-10 (2d Cir. 1959) ("That the Arbitration Act envisages a distinction between the entire contract between the parties on the one hand and the arbitration clause of the contract on the other is plain on the face of the statute.  Section 2 [of the FAA] does not purport to affect the contract as a whole.  On the contrary, it makes 'valid, irrevocable, and enforceable' only a 'written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by

Nearly forty years after its decision in Prima Paint, the Supreme Court held that a claim that a contract containing an arbitration provision was void for illegality must also be addressed by an arbitrator rather than a court. Buckeye, 546 U.S. 440. In so holding, the Court reaffirmed the following propositions: "First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance. Third, this arbitration law applies in state as well as federal courts." Id. at 445-46

Because Higher Ground contests the validity of the contract as a whole, and not specifically the arbitration clause, Buckeye would seem to indicate that the factual question of whether the Service Agreement was ever actually signed must be decided by an arbitrator. The Buckeye Court was careful, however, to narrow its holding's scope:

> The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded. Our opinion today addresses only the former, and does not speak to the issue decided in the cases cited by respondents . . ., which hold that it is for courts to decide whether the alleged obligor ever signed the contract, Chastain v. Robinson-Humphrey Co., 957 F.2d 851 (11th Cir. 1992), whether the signor lacked authority to commit the alleged principal, Sandvik AB v. Advent Int'l Corp., 220 F.3d 99 (3d Cir. 2000); Sphere Drake Ins. Ltd. v. All American Ins. Co., 256 F.3d 587 (7th Cir. 2001), and whether the signor lacked the mental capacity to assent, Spahr v. Secco, 330 F.3d 1266 (10th Cir. 2003).

Id. at 444.

Higher Ground argues that if it never signed the Service Agreement, any contract between the parties fails to satisfy the statute of frauds, and that the Court therefore must decide

_____

arbitration a controversy thereafter arising out of such contract or transaction.'").

the factual question, because it goes to "whether any agreement between [Higher Ground] and [ProLink] was ever concluded." Buckeye, 546 U.S. at 444. A superficial reading of the cases cited in Buckeye might seem to support this view. In Chastain, one party alleged that it had never signed the contract which contained the arbitration clause. The Eleventh Circuit explicitly distinguished the Prima Paint doctrine and noted that,

> [u]nder normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract *in general*. . . . The calculus changes when . . . the party seeking to avoid the arbitration has not signed any contract requiring arbitration.   In such a case, that party is challenging the very existence of *any* agreement, *including the existence of an agreement to arbitrate*. Under these circumstances, there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to the Act. If a party has not signed an agreement containing arbitration language, such party may not have agreed to submit grievances to arbitration at all. Therefore, before sending any such grievances to arbitration, *the district court itself* must first decide whether or not the non-signing party can nonetheless be bound by the contractual language.

957 F.2d at 854 (internal citations omitted; emphasis in original).

As in Chastain, Higher Ground, the party seeking to avoid arbitration, asserts that it did not sign any contract requiring arbitration. Chastain is sharply distinguishable, however. In that case, the factual question of whether a particular document had been signed went to whether an agreement between the parties existed, and not merely to the satisfaction of the statute of frauds. Failure to satisfy the statute of frauds does not mean that no contract exists; that statute "does not deprive the agreement of all effect, and it is still appropriate to refer to the agreement as a contract." 2 Farnsworth on Contracts § 6.10 at 190 (2004). Rather, "a failure to satisfy the statute as to a party merely precludes enforcement of the agreement against that party." Id.

14

Unlike Chastain, Higher Ground stops short of arguing that there was no agreement between itself and ProLink.  Higher Ground does not dispute ProLink's contention that Ward presented it with a copy of the Service Agreement (Ward Aff. ¶¶ 9-10), nor does it allege that it objected to, or was unfamiliar with, the terms of the Service Agreement.  Caeners's affidavit states only that he has "no recollection of ever signing such an agreement and . . . no reason to believe that such an agreement was ever signed." (Caeners Aff. ¶ 5.)  By this light, the instant dispute concerns a potentially voidable contract and thus falls squarely within the Prima Paint–Buckeye line of cases; any factual dispute as to the validity of the contract must be referred to an arbitrator.

Whether or not the Service Agreement was ever signed by Higher Ground, Higher Ground's conduct "manifested an intent to adopt or agree to the unsigned" Agreement, including the arbitration clause.  Inter County Glass, Inc. v. Trustees of Local Union 580, No. 04 Civ. 3579, 2007 WL 2908094, at *3 (E.D.N.Y. Sept. 28, 2007).  ProLink correctly maintains that the conduct of Higher Ground in requesting service, parts and repairs manifested a meeting of the minds sufficient to constitute a contract.  (Third-Party Def.'s Reply 8-9.)  ProLink in turn relied on the Service Agreement in installing and servicing the GPS units and training Higher Ground's employees.

Higher Ground accepted the benefit of the bargain (however dubious it now finds those benefits to have been) and, in so doing, ratified the contract by its actions.  As Higher Ground argues, however, it remains a question for the Court whether that conduct manifests assent to the arbitration clause itself.  Under the circumstances presented here, Higher Ground's acceptance of the bargain binds it not merely to the basic terms proffered by ProLink, but also to the arbitration clause and the other "fine print" provisions of the contract.

15

In Deloitte Noraudit A/S v. Deloitte Haskins & Sells, 9 F.3d 1060, 1064 (2d Cir. 1993), the Second Circuit found that a party that had received a contract, made no objections to its terms, and proceeded to benefit from it, was estopped from avoiding arbitration despite having never signed the contract.  See also Genesco, 815 F.2d at 846 ("[w]e focus not on whether there was subjective agreement as to each clause in the contract, but on whether there was an objective agreement with respect to the entire contract"); Just In-Materials Designs, Ltd. v. I.T.A.D. Assoc., Inc., 61 N.Y.2d 882, 883 (1984) (retention of broker's sales note and seller's contract form, both containing arbitration clauses, and acceptance and payment for goods constituted ratification of contract and arbitration clause, even though the latter provision had never been expressly discussed with either party).[6]

In the instant case, Higher Ground received the Service Agreement containing the clear arbitration clause on April 27, 2005 and made no objection to any of its terms.  Higher Ground argues that it received no benefit from the Service Agreement because the structure of the Pay-for-Play leasing arrangement required it to remit the funds it collected from the GPS units to National City.  (Third-Party Pl.'s Opp'n 18-19.)  But this argument is unavailing because Higher

---

[6] In a "battle of the forms" context, governed by New York's Uniform Commercial Code ("UCC") § 2-207, the answer might be different.  New York's U.C.C. § 2-207 interprets any additional terms made in an acceptance of a contract for the sale of goods between merchants to be part of the contract, *unless such terms materially alter the contract*.  N.Y.U.C.C. § 2-207(a) (McKinney's 1964, Supp. 1988).  The New York Court of Appeals has deemed the addition of an arbitration clause to be material.  See Matter of Marlene Indus. Corp., 45 N.Y.2d 327, 334 (1978) ("the inclusion of an arbitration agreement materially alters a contract for the sale of goods, and thus, pursuant to section 2-207, it will not become a part of such a contract unless both parties explicitly agree to it.").  The instant case, however, does not involve an exchange of written forms containing conflicting terms, or the confirmation of an oral agreement by a writing containing additional terms, nor is it controlled by the UCC since it does not involve a sale of goods.  Here, there is only one writing evidencing the agreement between the parties, and it contains an arbitration clause.

Ground did receive a benefit in the form of an enhanced experience for the users of the golf course, as well as for Higher Ground itself. (Wille Aff., Ex. A ¶ 11.) Although the GPS units ProLink installed did not perform as Higher Ground expected and failed to deliver all the benefits Higher Ground anticipated (Id. ¶¶ 19-21), Higher Ground benefitted from the Service Agreement by calling on ProLink to install the GPS units, train Higher Ground's employees, and service the GPS units throughout 2005.  Under Deloitte, these interactions manifest an intention to agree to the unsigned agreement that is sufficient to bind Higher Ground to the arbitration clause.

## III.    The Scope of the Agreement To Arbitrate

Once an agreement to arbitrate has been found, a court must then determine whether the parties agreed to arbitrate the particular dispute in question.  The court is to make this determination by applying the "federal substantive law of arbitrability" which mandates that

> questions of arbitrability must be addressed with a healthy regard
> for the federal policy favoring arbitration . . . . The Arbitration Act
> establishes that, as a matter of federal law, any doubts concerning
> the scope of arbitrable issues should be resolved in favor of
> arbitration, whether the problem at hand is the construction of the
> contract language itself, or an allegation of waiver, delay, or a like
> defense to arbitrability.

Reaseguradora Nacional, 991 F.2d at 48 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)); see also 9 U.S.C. § 2.  "Indeed, unless it can be said 'with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' the dispute should be submitted to arbitration."  Concourse Village, Inc. v. Local 32E, Service Employees Int'l Union, 822 F.2d 302, 304 (2d Cir.1987) (quoting United Steel Workers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960))."  Accordingly, "federal policy favoring arbitration requires [courts] to construe

arbitration clauses as broadly as possible." <u>Genesco</u>, 815 F.2d at 847.

ProLink asserts that the Third Party Complaint is based entirely on obligations governed by and provided for in the Service Agreement, and that the "gravamen of Higher Ground's complaint is its claim that the ProLink System that was installed at its country club by ProLink did not function properly." (Third-Party Def.'s Mem. 4.) Because the Service Agreement states that "[ProLink] shall maintain and repair the ProLink System" (Fisher Aff., Ex. A ¶ 4.6), ProLink argues that the complaint falls under the purview of the Agreement and must be arbitrated.

Higher Ground contends that its complaint against ProLink is predicated on the representations and warranties that ProLink made in inducing it to lease the units, not the conduct of ProLink in *servicing* them. In other words, Higher Grounds maintains that its complaint does not arise from any problems in the installation, configuration, or maintenance of the system, and that the Service Agreement, therefore, is simply not applicable to the dispute at hand. (Third-Party Pl.'s Opp'n 10-12.)

Higher Ground further characterizes the Service Agreement as limited in scope. Higher Ground notes that the first sentence of the arbitration clause – "all disputes under this Agreement shall be submitted to binding arbitration" – could instead have been phrased to cover all disputes arising out of or relating to "this Agreement *and the Lease Agreement*." (Fisher Aff., Ex. A ¶ 11; Third-Party Pl.'s Opp'n 14; emphasis added.) Higher Ground also argues that the first sentence of the arbitration clause is the "operative provision in the clause, whereas the later sentence [which states that arbitration "shall be the sole and exclusive procedure for resolution of disputes arising out of or relating to this Agreement"] was included to make clear that the procedures for resolving disputes, as identified by the first sentence, were the only procedures

18

available for resolving disputes otherwise covered by the first sentence." (Id. 16.)

Higher Ground's arguments are unpersuasive. While the Service Agreement could have been more artfully drafted, it commits to arbitration any "disputes *arising out of or relating to* this Agreement." (Fisher Aff., Ex. A ¶ 11; emphasis added.) Courts have repeatedly found the "arising out of or relating to" language to be the "paradigm of a broad clause." Collins & Aikman, 58 F.3d at 20; see also Threlkeld & Co., 923 F.2d at 248. The Second Circuit has clarified that if the allegations underlying the claims so much as "touch matters" covered by the parties' agreements, then those claims must be arbitrated. Genesco, 815 F.2d at 846 (internal citations omitted).

The claims raised by Higher Ground do "touch matters" covered by the Service Agreement. In its Third-Party Complaint, Higher Ground alleges that, in inducing Higher Ground to enter the Lease and Service Agreements, ProLink warranted and/or guaranteed a number of specifications about the product to be delivered. (Third-Party Compl. ¶ 14.) A court or arbitrator could not evaluate the claims made by Higher Ground without considering the representations made in the Service Agreement to which Higher Ground makes reference in its Complaint. The Complaint also alleges that "[t]he system that was provided to Higher Ground was not the system that was promised to Higher Ground and/or failed to perform as demonstrated, warranted and represented." (Third-Party Compl. ¶ 15.) This allegation also falls within the terms of the Service Agreement regarding the "installation, set-up and configuration of the ProLink System" (Fisher Aff., Ex. A ¶ 4.1), as well those regarding maintenance and performance (Id. at 5).

Higher Ground cites Rosen v. Mega Bloks, Inc., No. 06 Civ. 3474, 2007 WL 1958968 (S.D.N.Y. July 6, 2007) in support of its assertion that not every claim made in a suit that

19

involves an arbitration contract is necessarily governed by the arbitration contract.  (Third-Party Pl.'s Opp'n 13.)  In Mega Bloks, the buyers and sellers of a company signed one agreement covering the sale of the company and another agreement regarding the future employment of the sellers within the company.  Only the employment contract contained an arbitration provision.  The court held that, because the sale agreement did not contain an arbitration clause, there was no reason to assume that the arbitration clause in the employment agreement indicated that the parties agreed to arbitrate a claim arising under the sale agreement.  Id. at *12.

Mega Bloks is easily distinguishable, however.  In Mega Bloks, the plaintiffs' claims arose exclusively under the sale agreement, so there was no need for the court to interpret the employment agreement in order to resolve them.  Here, the only agreement governing the relationship between ProLink and Higher Ground is the Service Agreement containing the arbitration clause; the Lease Agreement only relates Higher Ground to National City.  Even if Higher Ground's claims center on the actions of ProLink leading up to the sale of the GPS system, those actions are inextricably connected to ProLink's actions in delivering, installing and servicing the units and cannot be resolved without reference to the Service Agreement.

Higher Ground also cites Power City Partners, L.P. v. ABB Power Generation, Inc., 910 F. Supp. 79 (N.D.N.Y. 1996).  In that case, Power City Partners had a contract with National Energy Production Corp. ("NEPCO") to design and build a power plant, and NEPCO had a subcontract with ABB Power Generation to install a generator.  Id. at 80.  The generator failed, causing a fire, and Power City Partners sued ABB for damages.  Id.  ABB in turn filed a third-party complaint against NEPCO, alleging that NEPCO's failure to provide an adequate fire protection system for the plant increased the fire-related damages.  Id.  NEPCO moved for a stay pending arbitration, according to the terms of their subcontract.  The court found that the degree

20

to which the parties were at fault was unrelated to any provisions in the contract between NEPCO and ABB, and that the dispute, accordingly, was not governed by the arbitration clause. Id. at 82. In the case currently before the court, however, the Service Agreement explicitly governs the installation and servicing of the GPS units, stating that ProLink "is responsible for installation, set-up and configuration of the ProLink System at the Golf Course." (Fisher Aff., Ex. A ¶ 4.1.) Any representations ProLink made leading up to Higher Ground's purchase of the GPS units are related to ProLink's contract to install and service those units. Because Higher Ground's allegations regarding the representations and warranties ProLink allegedly provided it "touch matters" covered in the Service Agreement, its claims fall within the scope of the arbitration clause.

## CONCLUSION

For the foregoing reasons, Third-Party Plaintiff's motion to stay the proceedings pending arbitration and to enforce the forum selection clause is granted.

SO ORDERED.

Dated: New York, New York
   March 23, 2009

            GERARD E. LYNCH
           United States District Judge

21